GATES, Respondent, vs. PAUL, Appellant.

*March 1—March 20, 1906.*

*Judgments: Interlocutory judgments: Conclusiveness: Findings of referee: Appeal: Partnership: Accounting.*

1. Under sec. 2883, Stats. 1898 (providing that an interlocutory judgment may be made disposing of all issues covered by the findings or decision and reserving further questions until the report, verdict, or subsequent findings), an interlocutory judgment substantially settling all the rights of the parties except those expressly reserved for further decision, having been affirmed by the supreme court with certain modifications, is conclusive, except as to those matters reserved.

2. In an action for the dissolution of a partnership and an accounting, an interlocutory judgment was entered reserving certain matters for further decision. Thereafter the matters reserved were tried by a referee and the findings of the referee are *held* supported by a preponderance of the evidence.

APPEAL from a judgment of the circuit court for La Crosse county: CHAS. M. WEBB, Judge. *Modified and affirmed.*

This is an appeal from final judgment entered in the same case considered by this court in 117 Wis. 170, 94 N. W. 55. Upon *remittitur* from this court the reference was taken up

and a large amount of evidence introduced, including evidence tending to prove that misrepresentations were made by plaintiff to defendant as an inducement to purchase the schedule A lands, whereby he was induced to believe their value to have been much greater than it was and to pay for five sixths thereof $57,200, while, in fact, their value was much less, also tending to prove that no title was conveyed to defendant by plaintiff's deed of the D lands; that defendant supposed he was receiving a warranty deed while, in fact, the instrument only contained a warranty against acts of the plaintiff. At the close of the testimony the referee made findings that defendant had expended for taxes upon the A lands $2,212.10 (changed by the court to $3,212.10); also had necessarily expended in addition on account of said lands $1,231.88 (changed by the court to $653); that plaintiff was entitled to no credits by reason of earnings or profits derived from the lands; that the transaction of organizing the corporation, East Coast Lumber Company, had between the defendant, Withee, and Gile, to whom the defendant had conveyed certain shares of various tracts of land in Florida and Georgia, consisted in a transfer of those lands to the corporation and the payment at the time of incorporating of certain sums of money and the issue of stock to each upon the basis of $1.489 of stock at par value for each $1 contributed by each of the incorporators either toward the acquirement of those lands or to the treasury of the corporation at the time of incorporating; that the amount paid by *Paul* and his associates in the purchase of the A lands was $57,200, and that, therefore, there had been issued stock on account of the five sixths of the A lands owned by *Paul* and his associates, and transferred to the corporation stock in proportion aforesaid, and that, at the same rate, the one sixth thereof, which belonged to the plaintiff, represented a value of $11,440, so that he held that 148.9 per cent. of this, or $17,043.16, was the amount of stock issued upon account of the one sixth of those

lands belonging to the plaintiff; that plaintiff's one sixth of the D lands had in no manner been transferred to the corporation, and no stock had been issued on account thereof. Both parties alleged exceptions to those findings and report of the referee, and the defendant moved for leave to amend his answer so as to allege (1) that he had been defrauded by misrepresentations of *Gates* as to the quality and value of the A lands to the extent of $30,000; (2) that he had failed to receive a warranty deed or any title of the D lands and had lost the entire consideration of $7,200 paid therefor. The court denied the motion to amend and overruled all of defendant's exceptions, except as to the amount of taxes paid on the A lands, as to which no dispute is here made, and sustained plaintiff's exceptions and amended the findings as by him requested: (1) with reference to the expenses incurred, as above stated, and as to which no question is raised, and made findings that neither the D, E, F, nor G lands were ever transferred to the corporation; that all of its 5,000 shares of stock had been issued; that 3,462.30 shares were issued for the various parcels of land transferred to it at agreed prices; 289 shares for money paid to the said corporation, and that the remaining 1,248.70 shares of stock were issued without consideration, and that one sixth of the lands described in Exhibit A are represented in said corporation by 2535/37515 of its stock, namely, 337.85 shares thereof, and accordingly judgment was entered that plaintiff pay into court for the defendant the $2,280, as adjudged by this court on the former appeal, and $553.33 as one sixth of the taxes paid, together with interest on both said sums from April 16, 1895, and also the sum of $108.83, being one sixth of the other expenses incurred by defendant, with interest from the commencement of the suit, and that, upon such payment less taxed costs, defendant execute to plaintiff conveyance of an undivided one-sixth of the D lands and procure to be transferred to him on

the books of the corporation 337.85 shares of its stock. From this judgment the defendant appeals.

*G. M. Woodward* and *E. C. Higbee,* attorneys, and *C. D. Rinehart,* of counsel, for the appellant.

For the respondent there was a brief by *George H. Gordon,* attorney, and *Winkler, Flanders, Smith, Bottum & Fawsett,* of counsel, and oral argument by *Mr. Gordon* and *Mr. F. C. Winkler.*

DODGE, J.   The interlocutory judgment in this case substantially settled all the rights of the parties except those expressly reserved for further decision, in this respect according with the provisions of sec. 2883, Stats. 1898, providing that an interlocutory judgment may be made disposing of all issues covered by the finding or decision and reserving further questions until the report, verdict, or subsequent finding.   That judgment having been affirmed by this court with certain modifications is conclusive, except as to the matters reserved.   It decided that defendant held one sixth of the A and D lands in trust for the plaintiff; that the plaintiff is chargeable with certain specific amounts and with the taxes paid by the defendant on account of such one-sixth interest and any other necessary expenses paid by the defendant on account thereof, less any income derived therefrom; and that the plaintiff is entitled to receive from the defendant such proportion of the shares of the East Coast Lumber Company as are fairly and equitably represented by plaintiff's one-sixth interest in the lands described in Exhibit A, also by his one-sixth interest in the lands described in Exhibit D, if the same shall be found to have been conveyed to that corporation. There were, therefore, left open for future consideration the questions of the amount of taxes and other expenses paid by the defendant, conveyance of the plaintiff's one-sixth interest in the D lands to the corporation, and the amount of capital

stock issued by the corporation by reason of the receipt by it of the plaintiff's interest in the lands. This last question became confined to the one-sixth interest in the A lands upon its appearing, as it does without dispute, that the one-sixth interest in the D lands has never been conveyed away by defendant, and can be reconveyed to plaintiff. The application to amend the answer by setting up: (1) the failure of title to the D lands; and (2) misrepresentation as to the quality of the A lands, was properly denied, for the reason that no such amendments were necessary. Such questions, if they bore in any way upon the equitable rights of the plaintiff to receive any sums from the defendant, were open under the pleadings as they already existed, and evidence was admissible upon them just as it was admissible upon the question of plaintiff's misrepresentation as to the amount paid for the D lands upon which this court passed in correction and modification of the trial court's interlocutory judgment. As stated in our former opinion, any evidence which the defendant considered necessary by reason of the amendment to plaintiff's cause of action, he had ample opportunity to apply to the trial court for leave to introduce before that judgment, and, doubtless, so far as any such evidence bore upon the issues submitted to the referee, it was admissible without any amendment.

Among the issues so submitted by reference, the only one of special importance upon this appeal is the amount of stock issued by the corporation fairly and equitably represented by plaintiff's one-sixth interest in the A lands. This, of course, depends on what was the transaction in fact had between the defendant and his associates, Withee and Gile, with reference to the organization of the corporation and the consideration for which the stock was issued by it. As preliminary to that transaction, which took place in December, 1896, and January, 1897, it must be borne in mind that for some two years or more Mr. Paul, in this association, had been making large investments in timber lands in Florida and Georgia, involv-

ing extended negotiations for, and examinations of, numerous different tracts, as to some of which the negotiations resulted in purchase either of the whole title or of some interest therein, and as to others fell through without result, and, in some cases, lands for which money had been spent were apparently deemed not worth conveying to the company. In this situation it was first proposed that certain tracts of land, to which the parties had contributed in greater or less proportion, and were understood between themselves to have interests accordingly, should be turned over to the corporation at a certain specified price per acre, payable in stock at par, and that money enough should be further contributed by the several partners to supply the treasury for the prospective erection of mill, railroad, etc., for which the balance of the stock should be issued at par. On this basis the lands were to represent about $384,000 and additional money to the amount of about $116,000 was to be contributed. It is claimed by the defendant that this method was abandoned and that, in lieu thereof, it was decided to treat the moneys which had already been contributed by the several members to the enterprise as above described and the moneys which they were able or ready to contribute at the time of the forming of the corporation on the same basis, and to issue therefor substantially the whole stock of the corporation, and that it was ascertained by accounting among them that they had already contributed about $234,000, and agreed to supply in cash to the treasury about $83,000 more. Thereupon they agreed to issue stock at the percentage of 1.489 dollars par value for each dollar so contributed. The amounts were slightly varied, so that this resulted in an issue of stock of 4,271 shares, leaving 279 shares unissued. Of this 3,350 were issued to the defendant *John Paul,* 848 to Withee, and 523 to Gile. The referee held that the adoption of the latter plan was established by the evidence and that, therefore, it must be held that so much stock was issued by the corporation on account of the A lands

as equaled 1.489 dollars of the money which was shown to have been invested in those lands up to the time of the organization of the corporation. On exception to the referee's report and findings, the court held that the evidence established that the Exhibit A lands were transferred to the corporation at an agreed price of $1.25 per acre, as in accordance with the original scheme above mentioned, and held that stock at this price for one sixth of the A lands belonged to plaintiff together with one sixth of a quantity of stock which he held to have been issued without any consideration whatever, because certain lands ostensibly involved in the capitalization had never been conveyed to the corporation, and because he held the evidence insufficient to establish the payment of any money into the treasury of the corporation by the defendant *Paul.*

It will hardly be justifiable to attempt a review of the large amount of evidence, oral and documentary, upon which these findings were based. We have examined it with care, and have reached the conclusion that the general plan of incorporation and stock issued as found by the referee is supported by a preponderance of such evidence. It may, however, be advisable to mention a few of the more salient circumstances which we deem persuasive. The two theories above outlined, namely, that of the issue of stock in proportion to the money contribution to the pool both before and at the organization of the corporation, which we shall designate as the referee's theory, and that of the issue of stock at a certain fixed price per acre, which may be referred to as the court's theory, are each supported by some parol testimony. The defendant did testify on two occasions that the A lands were put into the corporation for stock at $1.25 an acre, but he modified this by saying that was the price at which they were carried in the inventory and that the details of the bargain and issue of stock were arranged by his son and not by him. The son who had charge of the matter testifies positively that the original

plan of issuing stock according to price per acre was abandoned, and the plan according to the referee's theory was adopted. As between these there is, first, the extreme improbability that these three men, all business men and capable of appreciating their own interests, should have met upon the court's theory, for we find that the prices named on the lands were entirely arbitrary, having little or no relation to their actual cost, in some cases being nearly threefold, and in others less than twice such cost, and that those lands were owned by the three incorporators in widely different proportions. Thus, the Westinghouse lands were owned, one half by *Paul* and one quarter each by Withee and Gile. The Land & Trust lands were owned, approximately three fourths by *Paul* and one eighth each by Withee and Gile, and another considerable tract of land was owned entirely by *Paul* and another was owned by *Paul* and Withee, to the exclusion of Gile; hence whatever margin of profit existed between the cost price and the stipulated price for these lands at which they were first proposed to be turned into the corporation, resulted in a substantial advantage in favor of *Paul* over both the others and in favor of *Paul* and Withee over Gile. It is entirely probable that when such plan was considered carefully it would have been rejected, while, on the other hand, a proposition to consider each dollar of actual investment as entitled to an equal interest in the corporation was likely to be approved. Each of the two theories is claimed to be supported by certain documents made at the time of the organization of the corporation. One is known as Exhibit 6, and contains a plan for the issue of stock mainly at a fixed price per acre for the land and about $116,000 thereof for money, resulting in a proportion of the stock quite inconsistent with that finally issued, but especially involving payments of money by the several incorporators in very different amounts and proportions from that of which there is any evidence. Thus upon that plan Mr. Gile was to pay in $13,760, while,

confessedly, he only paid $1,000; and *Mr. Paul* was to pay some $78,000, while his utmost claim is that he paid in $58,900. On the other hand are three computations known as Exhibits 10, 11, and 12, fully testified to by R. H. Paul as the original memoranda upon which the stock was issued, and also established and identified by a bookkeeper as made by him for that purpose. These accord almost exactly with the stock concededly issued to each of the members of the pool, and, upon their face, fully confirm the referee's theory. In answer to this, however, it is asserted, first, that the amount of money by these documents declared to have been invested in the so-called pool prior to the organization of the corporation, to wit, about $234,000, is shown to be impossible to demonstration, and counsel presents a list of the elsewhere stated cost price of the various tracts of land going into the corporation other than the so-called Land & Trust lands (also called Exhibit G lands), which amount is only $81,000. This amount is not accurate, but shown by other incidental evidence to have been somewhat larger. He says the record is silent as to the cost of the Exhibit G lands, which were about 91,000 acres. There is no positive evidence of just the price which was paid for these lands. They were the subject of long negotiation with different parties, and it does appear that the party from whom *Mr. Paul* finally purchased them paid a little more than $1 an acre for them shortly before their sale to *Paul,* which perhaps supports an inference that *Mr. Paul* paid more, and this is confirmed by a letter from the plaintiff written at about the time of the organization of the corporation, to wit, February 2, 1897, stating that the land now held in Florida and Georgia cost purchase price $190,165. This, of course, would be exclusive of any expenditures upon lands by *Paul* with the purchase of which *Gates* had nothing to do. It also appears by Exhibit 6 that the G lands were treated by the corporators as having cost up to that time $1.50 per acre, or $137,000. Now, it is apparent from all

the evidence and correspondence that most of the lands purchased were burdened with an arrearage of taxes and, in addition, there had been one, two, or three years of taxes between the time of acquiring the lands and of the incorporation. Upon the A lands alone, where there was only one year of arrears, the taxes paid prior to incorporation amounted to nearly $5,000, and it is presumptively true that large amounts also had to be expended on the other properties. In addition to this, it is apparent that much expense had been incurred during 1894, 1895, and 1896 by *Mr. Paul* and persons employed by him in negotiating for various other tracts, making inspection thereof, investigating titles, procuring options, and in efforts to obtain possession and evict opposing claimants by litigation, etc., which might well have reached a very substantial figure. So that we cannot agree with counsel's inference that a total of $234,000 in land purchases may not have been expended in such efforts and in the work which had been done in the way of preparation to log and manufacture this timber before the corporation was organized. A further ground for the rejection of the referee's theory was the refusal of the court to believe that defendant contributed any money or equivalent, beyond his interest in the lands at or about the time of incorporating, as consideration for the stock issued to him. The amount claimed and found by the referee to have been contributed then was $58,900 by *Paul*, $19,846 by Withee, and $1,060 by Gile, total $79,800. With reference to this payment by defendant there is positive evidence of defendant and Withee that he did contribute some considerable amount, while R. H. Paul testifies positively to that amount and it is confirmed by Exhibit 12, already referred to. True, it does not appear that he gave his check to the treasurer of the East Coast Lumber Company, but that he passed the amount to its credit on the books of John Paul Lumber Company, on which they seemed to have drawn in large amount for the expenses of erecting their plant, rail-

road, etc., being indebted to it some $127,000 in November, 1899. Against this there is no evidence, except perhaps the suspicion resulting from the failure to produce the books of the East Coast Company or of the John Paul Lumber Company. But the fact that substantially the amounts of money specified in Exhibits 10, 11, and 12 were received by the corporation in addition to its timber lands is rendered certain to demonstration by a document known as Exhibit 5, which was a statement of the assets and property of the corporation and of the business done by it since its inception, made November 1, 1899, and which shows that, apart from the ordinary mercantile transactions, which substantially balanced each other, the company had borrowed from John Paul Lumber Company $127,800 in excess of payments to it and had received as proceeds of its lumber operations, in excess of the detail cost thereof, $66,800, and that it had constructed and acquired properties in the way of mill plant and railroad, additional real estate and timber leases and other equipment costing approximately $280,000; so that the corporation must have had about $80,000 of money capital besides what it borrowed and received from its business and besides its timber lands. The total shown to have been contributed by Exhibits 10, 11, and 12, inclusive of *Mr. Paul's* $58,900, is either $79,800 or $82,900, subject to some uncertainty as to a $3,100 item. Add to this the extreme improbability that Mr. Withee and Mr. Gile would, upon organization of the corporation, have contributed their money without seeing to it that *Mr. Paul* contributed that which he ought to on the same basis, and we feel that the repudiation by the court of the testimony that he did so pay is against a very clear preponderance of the evidence.

Another transaction had in November, 1899, may perhaps as well be mentioned here. It has no particular effect upon results derived from the referee's theory, but was deemed material by the court because of the holding that *Mr. Paul* did

not pay anything for the stock which he then received. It will be remembered that in the original organization there were left 279 shares of unissued stock. At a meeting of the corporation in November, 1899, it was decided to sell said stock at par for money to the existing members of the corporation in the proportion of their then holdings, and, as claimed by the defendant, it was thereupon so issued, 198 shares to *John Paul,* fifty shares to Withee, and thirty-one shares to Gile. Confessedly, both Gile and Withee paid dollar for dollar for their stock, but the court held there was no sufficient evidence of the payment by *Paul* of his $19,800. Such payment was testified to by R. H. Paul and John J. Paul, and the arrangement was testified to by Mr. Tiffany, who represented the interest of Gile, then deceased, and who at this time became a director of the corporation, representing the interest of Mr. Gile's estate. Against this there is no particle of evidence and no reason for disbelieving it, except possibly nonproduction of the books. Now it is inconceivable that *Mr. Paul,* having agreed to pay this money, and being, in practical effect, through the medium of the John Paul Lumber Company, a creditor to the extent of $127,000, failed to contribute it either by money or by credit upon such account, as it is testified he did. No business man situated as Mr. Tiffany was would fail to see to it that his associate made this substantial contribution in consideration for the stock which he then received upon agreement so to do. We find it impossible to escape the conclusion that this money was also paid upon a perfectly valid agreement among all the stockholders as the price for the stock then issued to *Mr. Paul.* By that transaction it was all issued for money consideration and none of it for any interest in the A lands.

At about this same time defendant made deed to the corporation of the remaining one sixth of the A lands, of which it will be remembered he deeded only five sixths at the organization. It was defendant's claim that *Gates's* only right was

to acquire one sixth of these lands by payment of a proportionate part of the cost within one year, which at this time had fully expired; hence conveyance of them without further consideration was entirely consistent with the referee's theory that stock was issued in consideration of the money invested, for, upon that theory, the corporation should receive whatever had been acquired by *Paul* as the result of such investment. There is no evidence that defendant ever received any consideration in stock or otherwise for this last conveyance. If it were argued, as it is not, that *Paul* as a trustee ought to be held only for what he in fact received for plaintiff's interest in these lands, but also for their full value, we are convinced that the evidence fully established that their value did not exceed, if it equaled, the amount received by *Paul* in stock as hereinafter computed.

Starting, then, with the conclusion of fact that there was issued by the corporation and received by *Mr. Paul* and his associates stock of the corporation amounting at par to 148.9 per cent. of the amount which had been invested in these A lands at the time of the organization of the corporation, the question arises what amount is so shown to have been invested. The referee adopted the exact amount paid by *Paul* to and through *Gates* upon the purchase of these lands, but this, obviously, was not all; for in another finding it is established that he had paid taxes to the amount of $3,212.10 and other expenses to the amount of $653. There is considerable probability that some other payments were made, but we are unable to assert that fact from the evidence with sufficient clearness to override these findings, with which neither party finds any fault. These expenditures were just as much contributions by *Mr. Paul* and his associates and just as much entered into the $234,000 which the referee found they had contributed to the pool before organizing the corporation as the $57,200 paid as consideration for the deed; hence there is no question but that, upon the referee's theory, there was issued

stock in the above-stated proportion for this amount of money; hence the true amount of stock issued for these lands was 148.9 per cent. of $61,065.10, namely, 909.26 shares. But this is all that was so issued. The entire lands were conveyed to the corporation and no compensation by reason thereof given except upon this basis. Hence the plaintiff's right is to one sixth that amount instead of one fifth as the referee made his computation, based upon the further argument that, if five sixths were worth $57,200, one sixth must have been worth one fifth of that amount. This, however, was not the test, but, as already stated, the sole question was what amount was in fact issued and received by reason of the transfer to the corporation of one sixth of the A lands. That amount, upon the basis we have just stated, is 151.54 shares. The judgment should be modified by substituting this quantity for the 337.85 shares therein directed to be transferred to plaintiff.

*By the Court.*—The judgment is modified by substituting for the words and figures "three hundred thirty-seven and eighty-five one-hundredths (337.85) shares" the words and figures "one hundred fifty-one and fifty-four one-hundredths (151.54) shares," and, as so amended, is affirmed, with costs in favor of appellant.